# Exhibit 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 1:17-23923-CIV-MORENO**

MARIO ALBAN,

      Plaintiff,

v.

2K CLEVELANDER, LLC,

      Defendant.

_____ /

**DEFENDANT'S NOTICE OF SERVICE OF ANSWERS TO**
**PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT**

      The Defendant, 2K CLEVELANDER, LLC, by and through the undersigned counsel,

pursuant to Federal Rule of Civil Procedure 33, hereby gives Notice of Serving its Answers to

Plaintiff's First Set of Interrogatories.

*[Certificate of Service on Following Page]*

CASE NO.: 1:17-23923-CIV-MORENO

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 12th day of January, 2018, a true and correct copy of

the foregoing has been furnished via e-mail to all counsel of record.

> COLE, SCOTT & KISSANE, P.A.
> *Counsel for Defendant*
> Cole, Scott & Kissane Building
> 9150 South Dadeland Boulevard, Suite 1400
> P.O. Box 569015
> Miami, Florida 33256
> Telephone (786) 268-6415
> Facsimile (305) 373-2294
> Primary e-mail: cody.german@csklegal.com
> Secondary e-mail: rebecca.anguiano@csklegal.com

> By:   s/ Cody German
> JOHN C. GERMAN
> Florida Bar No.: 58654
> REBECCA R. ANGUIANO
> Florida Bar No.: 99690

1011.0026-00/8659821

CASE NO.: 1:17-23923-CIV-MORENO

## GENERAL OBJECTIONS

1. Defendant objects to each instruction, definition, document request, and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of the Court.

2. Defendant objects to each document request and interrogatory that is overly broad, unduly burdensome, or not reasonably calculated to lead to the discovery of admissible evidence.

3. Defendant objects to any request that requires the disclosure of information that exceed 3 years prior to the date of filing this lawsuit.

4. As it was not otherwise stipulated or ordered by the court, a party may only serve on any other party no more than 25 written interrogatories, including all discrete subparts. Though Plaintiff attempts to serve 24 written interrogatories, when including the many subparts included herein, the amounts of written requests far exceeds the allowable 25 pursuant to the Federal Rules of Civil Procedure.

5. The Defendant objects to any payroll disclosures that exceed the maximum time period for damages being sought by the Plaintiff in this lawsuit, which is three years before the filing of this lawsuit. Therefore, the discovery shall be limited to the Plaintiff's pay during the immediate three years before the lawsuit was filed.

6. Defendant incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for emphasis or some other reason. The failure to include any general objection in any specific response does not waive any general objection to that request. Moreover, Plaintiff does not waive its right to amend its response.

## RESPONSES AND OBJECTIONS TO PLAINTIFF'S
## FIRST INTERROGATORIES TO DEFENDANT

**INTERROGATORY NO. 1:**  Identify and state the name and address of the person answering these interrogatories and, if applicable, the person's official position or relationship with the party to whom the interrogatories are directed.

**Response:**   **Kittine Moreno, Director of Culture Resources and Compliance with the assistance of counsel**
**c/o Cole, Scott & Kissane, P.A.**
**9150 South Dadeland Blvd. - SUITE 1400**
**Miami, FL 33156**

3

CASE NO.: 1:17-23923-CIV-MORENO

**INTERROGATORY NO. 2:** Describe in detail all facts known to you which support or refute Plaintiff's allegations of not being properly paid as set forth in the most recent Complaint, including by name all individuals relied upon in ascertaining such facts and the particular facts of which each is aware.

**Response:**     **Plaintiff was responsible for clocking in at the commencement of his work and clocking out after the completion of all of his job duties which included providing superior guest service and maintaining Clevelander brand standards. Plaintiff was properly paid for all hours worked, and was properly paid for all overtime hours worked, if any. In March of 2014, Plaintiff became a 7i Exempt employee under the FLSA, as he received the requisite amount in commissions, and as such, was exempt from overtime pay.**

**INTERROGATORY NO. 3:** State the names, addresses, and telephone numbers of all individuals known by you and your attorney and/or your representatives to have knowledge of facts involved in this suit, designating for each a summary of the knowledge of facts known or believed to be known by each, and the source of their knowledge and whether a recorded statement has been taken from such individuals and the person taking such recorded statement and the date of such statement.

**Response:**     -  **Mario Alban, Plaintiff**
    **c/o Paul A. Sack, Esq.**
    **Paul A. Sack, P.A.**
    **1130 Washington Avenue Suite 3**
    **Miami Beach, FL 33139**

-  **Annie Borges, Former HR Director for Defendant**

    **Subject Matter: As the former Director of Human Resources, Ms. Borges has knowledge regarding the Defendant's payroll practices, Plaintiff's work schedules, job descriptions, policy surrounding Plaintiff's exemption status, as well as various other aspects pertaining to the Plaintiff's employment.**

-  **Mariaestella Lopez, former Payroll & Benefits Manager**

    **Subject Matter: As former Payroll & Benefits Manager, Ms. Lopez would have knowledge regarding the Defendant's payroll practices, Plaintiff's work schedules, job descriptions, policy surrounding Plaintiff's exemption status, as well as various other aspects pertaining to the Plaintiff's employment.**

-  **Kittine Moreno, Current HR Director for Defendant**

    **Subject Matter: As the Director of Human Resources, Ms. Moreno has knowledge regarding the Defendant's payroll**

4

practices, Plaintiff's work schedules, job descriptions, policy surrounding Plaintiff's exemption status, as well as various other aspects pertaining to the Plaintiff's employment.

- **Lisa Perez, Former HR Consultant for Defendant**

  **Subject Matter:** As a former consultant for Human Resources, Ms. Perez has knowledge regarding the Defendant's payroll practices, Plaintiff's work schedules, job descriptions, policy surrounding Plaintiff's exemption status, as well as various other aspects pertaining to the Plaintiff's employment.

- **Odalys Reyes, Former Payroll Administrator for Defendant**

  **Subject Matter:** As former Payroll Administrator, Ms. Reyes would have knowledge regarding the Defendant's payroll practices, Plaintiff's work schedules, job descriptions, policy surrounding Plaintiff's exemption status, as well as various other aspects pertaining to the Plaintiff's employment.

- **Marta Raimundez, Former Payroll Administrator for Defendant (Contract Employee)**

  **Subject Matter:** As former Contract Payroll Administrator, Ms. Raimundez would have knowledge regarding the Defendant's payroll practices, Plaintiff's work schedules, job descriptions, policy surrounding Plaintiff's exemption status, as well as various other aspects pertaining to the Plaintiff's employment.

- **Patrick McKenzie, Current Payroll Administrator for Defendant**

  **Subject Matter:** As Payroll Administrator, Mr. McKenzie would have knowledge regarding the Defendant's payroll practices, Plaintiff's work schedules, job descriptions, policy surrounding Plaintiff's exemption status, as well as various other aspects pertaining to the Plaintiff's employment.

**INTERROGATORY NO. 4:** Identify and set forth the name and address for all persons and entities responsible for creating, maintaining, and distributing Plaintiff's payroll, paychecks, and timecards in between October 25, 2013 and 6 months following Plaintiff's final day of work and the names and addresses of all payroll companies, accounting firms, bookkeepers, in-house accountants, finance directors, and human resource directors used by you between October 25, 2013 and 6 months following Plaintiff's final day of work.

CASE NO.: 1:17-23923-CIV-MORENO

**Response:**

- **Mariaestella Lopez**
  - o **40 peachtree valley rd. NE Apt. 2401 Atlanta, GA 30309**
- **Annie Borges**
  - o **9085 SW 113 Place. Miami, FL 33176**
- **Lisa Perez**
  - o **No known Address**
- **Kittine Moreno**
  - o **c/o Cole, Scott & Kissane P.A.**
- **Odalys Reyes**
  - o **419 SE 32nd Terr. Homestead, FL 33033**
- **Marta Raimundez (Contract Employee)**
  - o **No Known Address**
- **Patrick McKenzie**
  - o **c/o Cole, Scott & Kissane P.A.**
- **Melissa Rodriguez**
  - o **c/o Cole, Scott & Kissane P.A.**
- **Time Clock and Payroll Administration services from ADP, Inc.**
  - o **3350 SW 148th Ave. Miramar, FL 33027**

**INTERROGATORY NO. 5:** Set forth the names, addresses, and positions of all persons involved in implementing and/or attempting to implement Defendant's 7(i) exemption and explain all steps taken to roll out the attempted 7(i) exemption; identify all relevant documents. (*including, in addition to normal work, all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

**Response:**        **When Clevelander opted to move to an automatic service charge to be included on all guest checks they also reclassified employees in the roles of Bartender, Server and Barback as 7(i) exempt. Defendant implemented a system that increases compensation based in large measure on results of sales. This is to say, the automatic service charge was considered a commission distributed to the front of house service members and would be a motivational tool for them to increase sales, thereby increasing the earned service commission. Implementation of 7(i) included vetting all policy documents and procedures with Clevelander attorneys, and by Clevelander accountants at Deloitte. The 7(i) Exemption Policy and Tip Allocation Policy have already been presented as part of discovery, in addition to the update that occurred at the end of 2015.**

**INTERROGATORY NO. 6:** Set forth the specific date Plaintiff was notified that his rate of pay would be changed, the specific person(s) that told Plaintiff his rate of pay would be changed, whether Plaintiff agreed to the change in his rate of pay, and specify

6

precisely how and why the rate of pay changed for every change in pay between October 25, 2013 and Plaintiff's last day of work. (*including, in addition to normal work, for all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

**Response:**    **Plaintiff was notified in December 2015 that the structure of his payment would be changed. His rate of pay, however, never changed. The updated pay structure policy was circulated and employees had the option to either accept the new structures, or quit.**

**INTERROGATORY NO. 7:**  What did Defendant tell Plaintiff he would be paid and how he would be paid, including specifically what formula would be used to calculate his wages, in 2013, 2014, 2015, 2016, and 2017; state specifically what Plaintiff was promised, when he was promised it, and whether Plaintiff agreed to each specific change in pay. (*including, in addition to normal work, for all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

**Response:**    **In March of 2014, the new 7i payment structure was circulated and communicated via a 7i exemption policy and the tipping allocation policy, both dated March 2014. These two policy documents outlined and explained the 7i classification and the commission structure for what Plaintiff could expect.**

**In 2014, the bartender service commission included an allocation from the servers, which included 3% from the total beverage sales. The bartenders service commission then allocated 3% of total sales or 20% of service charge (whichever is greater) to the bar back service commission pool. Additionally, bartender service commission allocated 3% of total food sales, excluding Bond bar and associate meals, to the food runner service pool. Finally, bartenders allocated 1% of total sales for 1020 and c-level bussers only for shifts with promoter or entertainer driven revenue, excluding sports or private events. The bartenders then keep the remaining funds that are distributed equally by hours worked.**

**In December 2015 when Defendant made a change to the service commission allocation, this information was communicated via an updated 7i exemption policy in December 2015. The service commission allocation policy was also presented in December 2015.**

**In 2016, the bartender service commission included an allocation from the servers, which included 2.5% from the total beverage sales. The bartenders service commission then allocated 2.5% of total sales or 17% of service charge (whichever is greater) to the bar back service commission pool. Additionally, bartender service commission allocated 2.5% of total food sales, excluding associate meals, to the**

**COLE, SCOTT & KISSANE, P.A.**
COLE, SCOTT & KISSANE BUILDING - 9150 SOUTH DADELAND BOULEVARD - SUITE 1400 - P.O. BOX 569015 - MIAMI, FLORIDA 33256 - (305) 350-5300 - (305) 373-2294 FAX

CASE NO.: 1:17-23923-CIV-MORENO

food runner service pool. Also, bartender service commission allocated $10 per bartender, with sales in excess of $500, to the liquor runner pool. Bartender service commission pool also allocates 5% of total sales to c-level bussers. 4% of total sales is allocated to the Clevelander. The bartenders then keep the remaining funds that are distributed equally by hours worked.

Year 2017 is identical to 2016.

**INTERROGATORY NO. 8:**   Identify the terms of employment agreements and/or contracts with Plaintiff, the dates of execution and termination of each, whether Plaintiff and Defendant properly performed under each, and how and why each ended. (*including, in addition to normal work, all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

**Response:**   The Defendant did not have any employment agreement and/or contract with the Plaintiff. As such, this request is not applicable. Plaintiff is a Bartender whose job is to serve guests and provide a superior guest experience. In regard to Plaintiff's performance, Plaintiff has had multiple performance violations, the documentation of which has been included in Defendant's personnel file which was included in the production of documents in response to Plaintiff's request for production. Plaintiff's employment came to an end on August 2017, due to failure to abide by Clevelander's drug-free workplace policy, and failure to abide by safety and risk procedures.

**INTERROGATORY NO. 9:**   Identify the procedure used for monitoring and recording work hours in 2013, 2014, 2015, 2016, and 2017, identifying all devices (e.g., the type of timeclock) and personnel involved in these procedures and the personnel's specific responsibilities. (*including, in addition to normal work, all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

**Response:**   Defendant uses Time Clock and Payroll Administration services from ADP, Inc. The Time Clocks used by Clevelander are biometric clocks requiring that each employee enter his/her unique code and scan their programmed finger to clock in and out. There are a total of three Time Clocks available on Defendant's property and a fourth Time Clock located at Marlins Park. Employees are required to "clock in" at the beginning of each shift, "clock out" and "clock in" before and after each meal break, and "clock out" at the end of each shift. Employees are also responsible for advising his/her Manager and/or Human Resources of any and all times in which he/she has failed to "clock in" or "clock out" or if the employee "clocked in" late, so that

**COLE, SCOTT & KISSANE, P.A.**
COLE, SCOTT & KISSANE BUILDING - 9150 SOUTH DADELAND BOULEVARD - SUITE 1400 - P.O. BOX 569015 - MIAMI, FLORIDA 33256 - (305) 350-5300 - (305) 373-2294 FAX

CASE NO.: 1:17-23923-CIV-MORENO

his/her time is corrected to properly reflect all time worked. *See also*, Policy regarding Recording Hours.

Each Team Member/Employee is responsible for complying with proper "clock in" and "clock out" procedures and ensuring accurate recording of his/her time and for advising of any discrepancies.

Managers are responsible for signing Time Clock related forms and providing same to Human Resources

The Payroll Administrator is responsible for editing the timecards in the ADP system prior to the beginning of the payroll processing period, only when necessary, and ensuring proper payment for all hours worked.

**INTERROGATORY NO. 10:** Set forth Plaintiff's work responsibilities and position; the date and reasons the Plaintiff ceased working for the Defendant; as well as the details of each disciplinary incident or other incident involving the Plaintiff and identify all documents pertaining to each.

**Response:** While employed by Defendant, Plaintiff was a Bartender whose job is to serve guests and provide a superior guest experience. Plaintiff was terminated on August 25, 2017. In 2012, Plaintiff had several disciplinary actions as it relates to breaking Clevelander's time and attendance policy, as well as its proof of identification policy. On August 22, 2017 Plaintiff violated Clevelander's drug-free workplace policy. Plaintiff was caught in possession of a marijuana cigarette. All these disciplinary actions are documented in the Plaintiff's employment file.

**INTERROGATORY NO. 11:** Provide all facts (including all relevant individuals, dates, and calculations) and identify all documents supporting your affirmative defenses.

**Response:** Defendant asserts that the Plaintiff was exempt from overtime, pursuant to the Retail Sales Exemption, as he worked for a retail sales establishment as a Bartender and, he received more than 50% of his compensation as commissions, and his pay was more than 1.5 times the applicable minimum wage for all hours worked in excess of 40 hours per week under 29 USC § 207(i). The calculation in relation to the aforementioned can be found in the 7(i) Exemption Policy dated March of 2014, the Tipping Procedure Policy dated March of 2014. Moreover, individual daily service commission calculations can be found in Daily Commission Reports and Bartender Commission Reports.

9

**COLE, SCOTT & KISSANE, P.A.**

Furthermore, the Defendant asserts that if Plaintiff proves that Defendant acted in violation of the FLSA, either by action or omission, which is denied, such action or omission was not willful or reckless, but rather was in good faith, and based on a reasonable belief that such action or omission was not in violation of the FLSA as displayed by the calculations made based on the aforementioned documentation. Additionally, the Defendant asserts that all actions taken by Defendant with regard to the Plaintiff's employment were made in good faith, and without malice or intent to harm as Plaintiff was properly compensated in full for the time worked pursuant to Defendant's bona fide commission system as well as Plaintiff was an at-will employee wherein his employment came to an end as a result of violating Company policy which had nothing to do with how Defendant compensated Plaintiff.

Defendant asserts that Plaintiff's compensation was calculated and paid pursuant to 29 USC § 207(i) in that Plaintiff agreed to the same pursuant to the 7(i) Exemption Policy dated March of 2014, the Tipping Procedure Policy dated March of 2014, 7(i) exemption policy dated December 2015, the service commission allocation policy dated December 2015), and as such all amounts owed to the Plaintiff have been satisfied by the Defendant for Plaintiff was properly compensated under the exemption.

Plaintiff failed to mitigate his damages. At no point in time prior to the filing of this lawsuit did Plaintiff notify the Defendant of any issues regarding compensation, if any existed at all. In the event that there is a bona fide dispute, it could have been mitigated pre-suit.

Plaintiff is potentially barred by the doctrines of estoppel and/or silence. Plaintiff failed to notify or communicate any issues Plaintiff had in regard to amounts owed in relation to hours worked to Defendant, as Defendant was not put on notice of any compensation disputes until the filing of this lawsuit.

**INTERROGATORY NO. 12:**   State with particularity the total amount of compensation paid to the Plaintiff from October 25, 2013 up until his last day of work for each week and for each pay period, providing for each week and pay period, the pay date, and the number of hours worked. (*including, in addition to normal work, all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

**Response:**   Objection. Defendant objects to the disclosure of information in relation to the time period outside the scope of what was pled in Plaintiff's Complaint and Statement of Claim. Notwithstanding the foregoing objection, and without waiver of same, as it pertains to total

10

CASE NO.: 1:17-23923-CIV-MORENO

amounts of compensation paid to Plaintiff during the relevant time period, please refer to Pay Statements and Daily Commission Reports which set forth all payments made to Plaintiff within the relevant time period.

**INTERROGATORY NO. 13:** When an employee notified the Clevelander of a correction in the recordation of their time worked, how did this affect the previous calculation of 'commissions' and what steps did the Clevelander take to re-calculate commissions for all affected employees; set forth all actions taken to make these corrections for Plaintiff and how it affected his pay. (*including, in addition to normal work, all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

**Response:**   **If a team member comes and states that there was a time clock error after payroll was processed and paid, human resources would verify with the food and beverage manager as to the veracity of the claim and correct it accordingly. If there was a problem, the service commissions would be re-calculated and retroactively applied.**

**INTERROGATORY NO. 14:** Set forth all payments made to Plaintiff from October 25, 2013 up until his last day of work to adjust for prior errors in payment or to otherwise compensate the Plaintiff for payment that should have been made in a previous pay period; provide the reasons for all of these payments and a description of each respective error. (*including, in addition to normal work, all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

**Response:**   **Objection. Defendant objects to the disclosure of information in relation to the time period outside the scope of what was pled in Plaintiff's Complaint and Statement of Claim. Notwithstanding the foregoing objection, and without waiver of same, as it pertains to amounts of compensation paid to Plaintiff during the relevant time period, and adjustments made pertaining to the same, if any, there were no errors in regard to amounts paid to Plaintiff, however there were a total of 19 time clock errors which were proactively corrected before payroll processing. Please refer to Pay Statements, Daily Commission Reports, and Weekly Tip Reports which set forth all payments made to Plaintiff within the relevant time period.**

**INTERROGATORY NO. 15:** State with particularity the exact calculation of Plaintiff's pay for each day and pay period he worked from October 25, 2013 up until his last day of work, the rate of pay, the formula used to determine Plaintiff's pay, the calculation and amount of her FLSA 'Regular Rate'; and include all respective dollar amounts used in any formula to calculate his pay (populate the formula) (*including, in addition to normal work, all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

CASE NO.: 1:17-23923-CIV-MORENO

**Response:** Objection. Defendant objects to the disclosure of information in relation to the time period outside the scope of what was pled in Plaintiff's Complaint and Statement of Claim. Notwithstanding the foregoing objection, and without waiver of same, to the formula used to calculate Plaintiff's pay is as follows:

In 2014, the bartender service commission included an allocation from the servers, which included 3% from the total beverage sales. The bartenders service commission then allocated 3% of total sales or 20% of service charge (whichever is greater) to the bar back service commission pool. Additionally, bartender service commission allocated 3% of total food sales, excluding Bond bar and associate meals, to the food runner service pool. Finally, bartenders allocated 1% of total sales for 1020 and c-level bussers only for shifts with promoter or entertainer driven revenue, excluding sports or private events. The bartenders then keep the remaining funds that are distributed equally by hours worked.

In 2016, the bartender service commission included an allocation from the servers, which included 2.5% from the total beverage sales. The bartenders service commission then allocated 2.5% of total sales or 17% of service charge (whichever is greater) to the bar back service commission pool. Additionally, bartender service commission allocated 2.5% of total food sales, excluding associate meals, to the food runner service pool. Also, bartender service commission allocated $10 per bartender, with sales in excess of $500, to the liquor runner pool. Bartender service commission pool also allocates 5% of total sales to c-level bussers. 4% of total sales is allocated to the Clevelander. The bartenders then keep the remaining funds that are distributed equally by hours worked.

Year 2017 is identical to 2016.

Finally, if employees are called into work for anything other than normal job duties (i.e. a meeting), employees are paid the base rate to meet Florida minimum wage standards.

**INTERROGATORY NO. 16:** Identify and provide a description, including the date of creation, of each respective document used to determine the formula and rate of pay used to pay Plaintiff above and each document used to calculate Plaintiff's pay (e.g., commission spreadsheets from #/#/#, excel spreadsheets from #/#/#, sales report from #/#/#, sales receipts from #/#/#, over-tips chart from #/#/#, etc.) (*including, in addition to normal work, all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

12

**COLE, SCOTT & KISSANE, P.A.**

COLE, SCOTT & KISSANE BUILDING - 9150 SOUTH DADELAND BOULEVARD - SUITE 1400 - P.O. BOX 569015 - MIAMI, FLORIDA 33256 - (305) 350-5300 - (305) 373-2294 FAX

CASE NO.: 1:17-23923-CIV-MORENO

**Response:**     Objection, interrogatory is vague and confusing. Interrogatory is unclear as to the exact information it is asking for. Notwithstanding the foregoing objection, and without waiver of same, Defendant's formula in regard to compensation to Plaintiff can be found in the Tipping Procedure Policy dated March of 2014 and the service allocation policy of 2015.

**INTERROGATORY NO. 17:**     Provide the names, addresses, and positions of all persons who input the figures used for calculating wages for Plaintiff into the spreadsheets between October 25, 2013 and Plaintiff's last day of work, and state which person was in charge of ensuring those figures and the wage calculations were accurate and correct.

**Response:**

Annie Borges, former HR Director for Defendant
Mariaestella Lopez, former Payroll & Benefits Manager
Michael Moore, former Food & Beverage Manager
Juan Pablo Vazquez, former Food & Beverage Manager
Jaime Mulet, former Food & Beverage Manager
Kassandra Cleary, former Food & Beverage Manager
Jean-Marc Etienne, former Food & Beverage Manager
Eduardo Escarra, former Food & Beverage Manager
Alex Freixa, current Bartender & Food & Beverage Supervisor
John Sturm, former Food & Beverage Manager
David Kaplan, former Food & Beverage Manager
Jeffrey Reyes, former Food & Beverage Manager
Manuel Delgado, former Food & Beverage Manager
Sandy Collins, former Food & Beverage Manager
Babak Shekhi, former Food & Beverage Manager
Amelia Wohrle, former Food & Beverage Manager
Edward Garcia, former Food & Beverage Manager
Adrian Remy, current Food & Beverage Manager
Samuel Dounn, former Food & Beverage Manager
Preston Baggett, current Food & Beverage Supervisor
Wesley Jonassaint, current Sr. Food & Beverage Manager
Erick Portillo, current Food & Beverage Training Supervisor
Odalys Reyes, former Payroll Administrator
Mirta Raimundez, former Contract Payroll Administrator
Patrick McKenzie, current Accounting Analyst & Payroll Administrator
Richard Gentile, former Sr. Food & Beverage Manager
Victor Camacho, former Sr. Food & Beverage Manager
Edgardo Farraro, former Sr. Food & Beverage Manager
Ryan Ruiz, former Sr. Food & Beverage Manager
Davian Barton, former General Cashier and current Accounting Assistant

13

CASE NO.: 1:17-23923-CIV-MORENO

> Leon Solis, former General Cashier
> Manuel Benitez, current Sr. Food & Beverage Manager
> Aminadad Rosario, current Sr. Food & Beverage Manager
> Juan Matas, former Sr. Food & Beverage Manager
> Chad Sherrer, current Sr. Food & Beverage Manager
> Hugh Garrity, current Food & Beverage Manager

**INTERROGATORY NO. 18:**    Set forth the precise formula and exact 'commission rate' for calculating Plaintiff's wages between October 25, 2013 and Plaintiff's last day of work. If this formula and 'commission rate' changed on any given week or pay period, provide exactly which day the formula and 'commission rate' changed; what the new formula and 'commission rate' was; whether Plaintiff was notified of the change; and how and why it changed. (*including, in addition to normal work, all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

**Response:**      **Objection. Defendant objects to the disclosure of information in relation to the time period outside the scope of what was pled in Plaintiff's Complaint and Statement of Claim. Notwithstanding the foregoing objection, and without waiver of same, to the formula used to calculate Plaintiff's pay is as follows:**

**In 2014, the bartender service commission included an allocation from the servers, which included 3% from the total beverage sales. The bartenders service commission then allocated 3% of total sales or 20% of service charge (whichever is greater) to the bar back service commission pool. Additionally, bartender service commission allocated 3% of total food sales, excluding Bond bar and associate meals, to the food runner service pool. Finally, bartenders allocated 1% of total sales for 1020 and c-level bussers only for shifts with promoter or entertainer driven revenue, excluding sports or private events. The bartenders then keep the remaining funds that are distributed equally by hours worked.**

**In 2016, the bartender service commission included an allocation from the servers, which included 2.5% from the total beverage sales. The bartenders service commission then allocated 2.5% of total sales or 17% of service charge (whichever is greater) to the bar back service commission pool. Additionally, bartender service commission allocated 2.5% of total food sales, excluding associate meals, to the food runner service pool. Also, bartender service commission allocated $10 per bartender, with sales in excess of $500, to the liquor runner pool. Bartender service commission pool also allocates 5% of total sales to c-level bussers. 4% of total sales is allocated to the Clevelander. The bartenders then keep the remaining funds that are distributed equally by hours worked.**

14

CASE NO.: 1:17-23923-CIV-MORENO

Year 2017 is identical to 2016.

Finally, if employees are called into work for anything other than normal job duties (i.e. a meeting), employees are paid the base rate to meet Florida minimum wage standards.

**INTERROGATORY NO. 19:**    State with specificity exactly which 'sales' and/or 'revenue' and/or 'service charges' were included in the formula used to calculate Plaintiff's pay each day Plaintiff worked between February 1, 2014 and Plaintiff's last day of work and exactly how these 'sales' and/or 'revenue' and/or 'service charges' were included in calculating the commission rate; and the exact dollar amount used to calculate his pay for each day Plaintiff worked between February 1, 2014 and his last day of work. (*including, in addition to normal work, all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

**Response:**    As it pertains to amounts of compensation paid to Plaintiff and how 'sales' and/or 'revenue' and/or 'service charges' were included in calculating the commission rate; and the exact dollar amount used to calculate pay during the relevant time period, please refer to documents produced in response to Plaintiff's request for production (specifically Pay Statements, Tipping Allocation Policy, Commission Reports and the 7(i) Exemption policy).

In 2014, every check had an 18% service charge. The bartender service commission included an allocation from the servers, which included 3% from the total beverage sales. The bartenders service commission then allocated 3% of total sales or 20% of service charge (whichever is greater) to the bar back service commission pool. Additionally, bartender service commission allocated 3% of total food sales, excluding Bond bar and associate meals, to the food runner service pool. Finally, bartenders allocated 1% of total sales for 1020 and c-level bussers only for shifts with promoter or entertainer driven revenue, excluding sports or private events. The bartenders then keep the remaining funds that are distributed equally by hours worked.

In 2016, the bartender service commission included an allocation from the servers, which included 2.5% from the total beverage sales. The bartenders service commission then allocated 2.5% of total sales or 17% of service charge (whichever is greater) to the bar back service commission pool. Additionally, bartender service commission allocated 2.5% of total food sales, excluding associate meals, to the food runner service pool. Also, bartender service commission allocated $10 per bartender, with sales in excess of $500, to the liquor runner pool. Bartender service commission pool also allocates 5% of total sales to c-level bussers. 4% of total sales is allocated to the

15

CASE NO.: 1:17-23923-CIV-MORENO

Clevelander. The bartenders then keep the remaining funds that are distributed equally by hours worked.

Year 2017 is identical to 2016.

**INTERROGATORY NO. 20:**    How was Plaintiff compensated when the Clevelander did not charge a customer because of a 'comp'; what was the exact amount of 'comps' taken out of the 'sales' and/or 'revenue' and/or 'service charges' corresponding to Plaintiff for each day Plaintiff worked between February 1, 2014 and Plaintiff's last day of work; and how much more would Plaintiff have been paid if it were not for the 'comps'?

**Response:**    Most often the need for a 'comp' on a guest check is due to there being an error with the order, such as Bartender/Server rings in something incorrectly; or a Guest did not like their order and therefore has sent it back. In each of these instances there is no revenue collected and therefore an associated service charge does not exist.

Outside of staff error and/or a guest not liking their order, there are two additional forms of 'comp' transactions used:

1) During an Event each guest request is rung up into the POS merely from an inventory tracking and control perspective. The actual event package is drafted up-front by the Event Sales Manager and often pre-paid to some extent by the guest. Event Pay is calculated based on the Event Pay calculation and process.

2) Whenever there is a comp for a guest check outside of the above stated reasons, the guest whose check is being comped has been advised up front that they are responsible for providing a tip amount, via cash or credit card) as a gratuity for service.

**INTERROGATORY NO. 21:**    What was the exact amount of 'bottle service'; 'beer tub'; and 'room service' 'sales' and/or 'revenue' and/or 'Service charges' for each day Plaintiff worked between February 1, 2014 and Plaintiff's last day of work (for the daily 'sales' and/or 'revenue' and/or 'Service charges' amount in the formula used to calculate Plaintiff's pay); and how did the Defendant compensate Plaintiff for his portion of 'bottle service'; 'beer tub'; and 'room service'.

**Response:**    Objection.  Providing  such  information  in  answering  this interrogatory  would  be  oppressive,  unduly  burdensome  and unnecessarily expensive as this request requires the Defendant to analyze every transaction in relation to bottle service'; 'beer tub'; and 'room service' 'sales' and/or 'revenue' and/or 'service charges' for each day Plaintiff worked and determine in which manner the

16

CASE NO.: 1:17-23923-CIV-MORENO

Plaintiff was compensated for his portion of 'bottle service'; 'beer tub'; and 'room service', if any. Notwithstanding the previous objection, and without waiver of same, Bartenders, like Plaintiff, do not get compensated based on room service or bottle service. In relation to beer tubs, Bartenders receive $1.00 per beer sold.

In 2014, every check had an 18% service charge. The bartender service commission included an allocation from the servers, which included 3% from the total beverage sales. The bartenders service commission then allocated 3% of total sales or 20% of service charge (whichever is greater) to the bar back service commission pool. Additionally, bartender service commission allocated 3% of total food sales, excluding Bond bar and associate meals, to the food runner service pool. Finally, bartenders allocated 1% of total sales for 1020 and c-level bussers only for shifts with promoter or entertainer driven revenue, excluding sports or private events. The bartenders then keep the remaining funds that are distributed equally by hours worked.

In 2016, the bartender service commission included an allocation from the servers, which included 2.5% from the total beverage sales. The bartenders service commission then allocated 2.5% of total sales or 17% of service charge (whichever is greater) to the bar back service commission pool. Additionally, bartender service commission allocated 2.5% of total food sales, excluding associate meals, to the food runner service pool. Also, bartender service commission allocated $10 per bartender, with sales in excess of $500, to the liquor runner pool. Bartender service commission pool also allocates 5% of total sales to c-level bussers. 4% of total sales is allocated to the Clevelander. The bartenders then keep the remaining funds that are distributed equally by hours worked.

Year 2017 is identical to 2016.

**INTERROGATORY NO. 22:**   What was the exact amount of 'credit card over tips' and 'cash over tips' for each day Plaintiff worked between October 25, 2013 and Plaintiff's last day of work (for the credit card tips amount in the formula used to calculate Plaintiff's pay). Exactly how much money did Plaintiff receive in credit-card-over-tips and cash over tips each day between October 25, 2013 and his final day. (*including, in addition to normal work, all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

**Response:**      Objection. Providing such information in answering this interrogatory would be oppressive, unduly burdensome and unnecessarily expensive as this request requires the Defendant to analyze every credit card transaction for each day Plaintiff worked. Notwithstanding the foregoing objection, and without waiver of same

17

CASE NO.: 1:17-23923-CIV-MORENO

the 'credit card over tips' are automatically included in the calculations for the tipping pool and distributed on each paycheck.

**INTERROGATORY NO. 23:**    State exactly which individual restaurants and bars at the Clevelander Plaintiff worked at for each work day between October 25, 2013 and his final day; explain the importance of this; and explain how the Clevelander tracked this information. (*including, in addition to normal work, all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

**Response:**    **Defendant objects to this interrogatory as it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Notwithstanding the foregoing objection, and without waiver of same, Plaintiff worked at 'Clevelander' and "Marlins".**

**INTERROGATORY NO. 24:**  Set forth each and every step you took to ensure that Plaintiff was properly paid, including each and every person involved in the calculation and/or auditing of Plaintiff's pay for each week since October 25, 2013 (and each person that calculated and entered the dollar amounts that populated the spreadsheets on each day Plaintiff worked since October 25, 2013). (*including, in addition to normal work, all public parties, private parties, events, special events, beer fests, holiday events, and other work*)

**Response:**    **See response to request #17 for individuals who assisted in ensuring that Plaintiff was paid properly. In regard to the steps taken to ensure Plaintiff was paid properly, at the end of each shift, the daily commission report is populated by either the manager on duty assigned to cash out the Servers and Bartenders (or a general cashier) based on the end of shift reports generated by the Point of Sales System (POS). Subsequently, the following business day, the accountant or payroll manager will audit and verify the data from the POS against the Daily Commission Report as well as the hours from Automatic Data Processing (ADP) to correct any errors, if any, and input service commission information into ADP for service payroll processing. Furthermore, the formulas contained in the commission report are derived from the Tipping Allocation Policy/ Service Commission Allocation Policy.**

**INTERROGATORY NO. 25:**  How did timecard errors affect the calculation of 'commissions' of Clevelander employees; in 2014, 2015, 2016, and 2017; what dates did Plaintiff have timecard errors after October 25, 2013; and how and what steps did the Clevelander take to ensure that employees were properly compensated when there were timeclock errors?

**Response:**    **Objection. Defendant objects to the disclosure of information in relation to the time period outside the scope of what was pled in**

18

CASE NO.: 1:17-23923-CIV-MORENO

Plaintiff's Complaint and Statement of Claim. Notwithstanding the foregoing objection, and without waiver of same, if a team member comes and states that there was a timecard error after payroll was processed and paid, human resources would verify with the food and beverage manager as to the veracity of the claim and correct it accordingly. If there was a problem, the service commissions would be re-calculated and retroactively applied. However, timecard errors were generally fixed proactively, using the same mechanisms, before payroll processing. That being said, timecard errors would not affect the calculations of commissions. Plaintiff had a total of 19 time clock errors which were proactively corrected before payroll processing. Please refer to Pay Statements, Daily Commission Reports which set forth all payments made to Plaintiff within the relevant time period.

*[Jurat Page to Follow]*

**COLE, SCOTT & KISSANE, P.A.**
COLE, SCOTT & KISSANE BUILDING - 9150 SOUTH DADELAND BOULEVARD - SUITE 1400 - P.O. BOX 569015 - MIAMI, FLORIDA 33256 - (305) 350-5300 - (305) 373-2294 FAX

BEFORE ME, the undersigned authority, personally appeared _Kitine Moruno_ who, after being duly cautioned and sworn, deposes and says that he/she has read the above Answers to Interrogatories attached hereto and that he/she has set his/her hand and seal thereto for the purposes therein expressed.

The foregoing instrument is sworn to and subscribed before me this 11TH day of JANUARY, 2018 by KITTINE MORENO who is:

1. _____✓____ Personally known to me.
2. _____ Who has produced following as identification:

Given under my hand and official seal this 11TH day of JANUARY 2018
Printed Name: SANDRA PLAZAS

Notary Public
State of Florida at Large
Notary I.D. Number
(if applicable)

My Commission Expires:

03/02/18

[Notary Seal]

Notary Public State of Florida
Sandra Plazas
My Commission FF 097381
Expires 03/02/2018